IN THE MATTER OF CITY OF DURHAM ANNEXATION ORDINANCE No. 5791

NO. 8214SC1357

(Filed 21 February 1984)

**1. Municipal Corporations § 2.6— extension of fire protection to annexed area**

The evidence supported the trial court's determination that a city's plan for the extension of fire protection services into an annexed area met the requirement of G.S. 160A-47(3) that such services be provided "on substantially the same basis and in the same manner" as in the rest of the city prior to annexation, notwithstanding the evidence showed that most of the annexed area is further away from existing fire stations than is most of the pre-annexation city, and there are no plans for the construction of an additional fire station in or near the annexed area.

**2. Municipal Corporations § 2.6— extension of fire protection to annexed area**

A city is not required to show in an annexation report that fire protection services will be at a level that is substantially equal to the "average service" received by citizens of the pre-annexation city.

**3. Municipal Corporations § 2.6— extension of fire protection to annexed area**

Response time is only one of the many factors entering into the court's consideration of whether an annexation report reflects plans to provide fire protection services to an annexed area "on substantially the same basis and in the same manner" as in the pre-annexation city area.

In re Durham Annexation Ordinance

4. **Municipal Corporations § 2.2— density of area to be annexed—use of preliminary census data**

A city's estimate of population density of an area to be annexed based on preliminary rather than final census data substantially complied with G.S. 160A-54. G.S. 160A-48.

5. **Municipal Corporations § 2.2— density of area to be annexed—consideration of apartment complex with surrounding area**

Consideration of a densely populated apartment complex together with the surrounding area in determining whether an area to be annexed met the population density test of G.S. 160A-48(c)(1) did not infringe on the spirit of the annexation law and was proper.

6. **Rules of Civil Procedure § 32— introduction of answers to opposing party's interrogatories**

Where petitioners had previously read into the record answers to their interrogatories concerning distances from municipal fire stations to certain points in an area to be annexed, the trial court did not err in permitting the city to offer answers to petitioners' interrogatories concerning how this distance related to response time. G.S. 1A-1, Rule 32.

7. **Evidence § 18— annexation—test runs from fire stations by patrol cars—response time**

Test runs made by patrol cars from existing municipal fire stations to points within an area to be annexed were competent to establish a basis for estimating future response times although the test runs were not conducted under substantially similar conditions of an alarm response by a fire engine, since the prospective outlook of this evidence necessarily removed it from the strict requirement of substantial similarity that is invoked in the typical experiment situation.

8. **Trial § 57— nonjury trial—presumption that incompetent evidence disregarded**

Where a finding of fact made by the judge sitting without a jury is supported in the record by competent as well as incompetent evidence, a rebuttable presumption arises that the judge disregarded the incompetent evidence and based his consideration solely on the competent evidence.

9. **Municipal Corporations § 2— time limitations of annexation statutes—constitutionality**

The time limitations specified in G.S. 160A-49 (establishing the procedure for annexation) did not violate petitioners' due process rights.

10. **Municipal Corporations § 2.4— time limitation for appeal of annexation—constitutionality**

The time limitation specified in G.S. 160A-50 for appeals from the adoption of an annexation ordinance did not violate petitioners' due process rights.

**11. Municipal Corporations § 2.2— annexation—development for urban purposes— constitutionality of statute**

The language of G.S. 160A-48(a)(2) which requires "[e]very part" of the area to be annexed to meet the requirement of subsection (c) that "[p]art of all" of the area must be developed for urban purposes is not unconstitutionally vague.

APPEAL by petitioners from *Clark (Giles R.), Judge.* Judgment entered 5 February 1982 in Superior Court, DURHAM County. Heard in the Court of Appeals 18 November 1983.

This is a civil action wherein petitioners seek to have an annexation ordinance adopted by respondent City of Durham declared null and void.

On 3 August 1981, the Durham City Council adopted a resolution stating its intent to annex certain areas outside the corporate limits of the city. On 17 August 1981, the council approved and made available for public inspection its Annexation Report and on 24 August 1981 approved and made available a Supplemental Annexation Report. A hearing on the proposed annexation was held on 8 September 1981. On 19 October 1981, the ordinance was adopted by the City Council.

Petitioners initiated this action on 18 November 1981 by filing a petition in Superior Court, pursuant to G.S. 160A-50, seeking review of the ordinance. The matter was heard on 11 January 1982 and, on 5 February 1982, the court announced judgment in favor of respondents. After the denial of petitioners' post-trial motions for judgment notwithstanding the verdict, for a new trial, and to amend the judgment, petitioners gave notice of appeal on 14 April 1982.

Petitioners group their assignments of error under four arguments which we consider below. In part III of this opinion, we reject petitioners' challenges to the admissibility of certain evidence. The sufficiency of the evidence is challenged in petitioners' first and second arguments, which we consider in light of our disposition in part III of petitioners' challenge to the admissibility and competence of some of the evidence.

*William V. McPherson for petitioner appellants.*

*John C. Randall pro se.*

*William I. Thornton, Jr., and Brenda M. Foreman for respondent appellee City of Durham.*

EAGLES, Judge.

I

Part three of Chapter 160A of the General Statutes governs the annexation of unincorporated contiguous areas by cities having a population of 5,000 or more. *See* G.S. 160A-45 through 160A-56 (Replacement Volume 3D, Part I, 1982) *amended by* Session Laws 1983, c. 636, s. 37.1, and c. 768, s. 25 (Supp. 1983). The basic question presented by a petition for review under G.S. 160A-50 is whether the procedure followed in adopting the ordinance was in substantial compliance with the applicable statutes. *Food Town Stores, Inc. v. City of Salisbury*, 300 N.C. 21, 265 S.E. 2d 123 (1980); *In re Annexation Ordinance (New Bern)*, 278 N.C. 641, 180 S.E. 2d 851 (1971); *McKenzie v. City of High Point*, 61 N.C. App. 393, 301 S.E. 2d 129, *rev. denied*, 308 N.C. 544, 302 S.E. 2d 885 (1983). Where the record of the annexation proceedings demonstrates *prima facie* substantial compliance with the applicable statutes, the burden is on the petitioner to show by competent evidence that the city has failed to meet the statutory requirements or that there was some irregularity in the proceedings that resulted in material prejudice to petitioners' rights. G.S. 160A-50; *In re Annexation Ordinance (Winston-Salem)*, 303 N.C. 220, 278 S.E. 2d 224 (1981); *In re Annexation Ordinance (New Bern)*, *supra*.

One of the applicable statutes is G.S. 160A-47 which provides in part as follows:

A municipality exercising authority under this Part shall make plans for the extension of services to the area proposed to be annexed and shall . . . prepare a report setting forth such plans to provide services to such area. The report shall include:

. . . .

(3) A statement setting forth the plans of the municipality for extending to the area to be annexed each major municipal service performed within the municipality at the time of annexation. Specifically, such plans shall:

a. Provide for extending police protection, fire protection . . . to the area to be annexed on the date of annexation on substantially the same basis and in the same manner as such services are provided within the rest of the municipality prior to annexation. . . .

[1] Petitioners' first argument is that the court erroneously found from evidence and concluded that the city's plan for the extension of fire protection services into the annexed area was in compliance with G.S. 160A-47(3).

In their argument, petitioners rely primarily on the fact, supported by evidence in the record, that most of the annexed area is further away from existing fire stations than is most of the pre-annexation city. Petitioners also point out that the planned extension of fire protection services into the annexed area includes no plans for the construction of an additional fire station in or near the annexed area. Petitioners contend that the findings of fact made by the court are not supported by the evidence and that the conclusions of law based on those findings are erroneous.

In the Supplemental Annexation Report, the City's plans for the provision of fire protection services are described as follows:

A patrol unit will be added in order to have sufficient resources to provide law enforcement and fire suppression services in Area 1. A patrol unit consists of one fully equipped Public Safety patrol car, four Public Safety Officers, uniforms and equipment for the officers, and operating costs for the patrol unit (fuel, maintenance). In addition, a relief position will be added to provide support to the additional patrol unit for sick leave and vacation.

Public Safety Station 5 located at 2212 Chapel Hill Road will have Station Area and Fire Suppression responsibility for Area 1. Tanker service will be required to provide adequate fire flow in some sections of Area 1 until water mains and fire hydrants are petitioned for and installed. This need

would be met by the dispatch of Tanker 16 from Fire Station 1. This is the same way the City serves other areas of the City that are without fire hydrants.

The judgment here contains forty-three separate findings of fact and fourteen separate conclusions of law. Twenty-nine of the findings and five of the conclusions deal specifically with the police and fire protection services that the City plans to furnish to the annexed area. Most of the findings dealing with fire protection describe the type and location of available equipment, facilities and manpower, and the manner in which fire protection services are provided in the city. All of the findings were excepted to in the record and ten of them are brought forward under the assignments of error relating to this argument. Three of those findings are set forth below:

40. If a fire call is received by the City from a location in the annexation area which indicates the involvement of a structure with two or more stories, an aerial unit will be dispatched by the City from Station No. 2 to the fire call. This is the same response as in the rest of the City where an aerial unit is dispatched from the closest station having such a unit (Station 1, 2 or 3).

41. Parts of the annexation area lie within two miles of Public Safety Station No. 5. Other parts of the annexation area lie at a distance greater than two miles from Public Safety Station No. 5. Most of the annexation area lies, by road mileage, within two to three and one half miles of Public Safety Station No. 5.

42. Test runs conducted by the City in marked and unmarked patrol vehicles to the annexation area show that the response times from Stations 5 and 6 to different locations in the annexation area ranged from three to approximately six minutes. Test runs conducted in other areas of the City from Stations 5, 6, and other public safety stations under similar conditions, indicate response times to some locations exceed six minutes.

The pertinent conclusions of law state in effect that the annexation report shows that the City will provide fire protection services to the annexed area in compliance with the requirements of

G.S. 160A-47(3)(a) and that the petitioners failed to carry their burden of proving otherwise.

We note first that there is no lack of evidence that some level of fire protection will be provided to the annexed area. The record emphatically discloses that fire protection was a key issue in the review proceeding below. The question presented is whether the evidence in the record supports the findings that the fire protection to be provided by the City to the annexed area will be provided "on substantially the same basis and in the same manner as [it is] provided within the rest of the municipality prior to annexation." G.S. 160A-47(3)(a).

The undisputed portions of the court's findings concerning existing fire protection facilities and service in the City of Durham are summarized in pertinent part below:

Durham has nine operating fire and public safety stations located throughout the City. These stations are each equipped with one or more pumper trucks; eight of them are manned by public safety officers who are trained fire fighters. The officers from the station patrol an assigned area in a patrol car. Each patrol car carries two fire extinguishers and other fire fighting equipment. Fire alarm calls are received at a central location in the City. Depending on the type and seriousness of the fire, the one or two closest pumper stations and their crews will respond to the call. Officers on patrol in the area respond to the call in their patrol cars and often arrive on the scene before the pumper trucks.

Three of the nine fire stations are equipped not only with pumper trucks but also with more sophisticated fire fighting equipment and a larger complement of fire fighters. The City operates one tanker truck which carries water and responds to fires in areas where there are no fire hydrants. The City operates two aerial trucks which respond to any fire involving a structure of two or more stories. The stations equipped with the tanker and aerial trucks are located towards the center of the City where there is a higher incidence of fires requiring the more sophisticated equipment, i.e., buildings are tall and close together, houses are of wooden frame construction, and there is a higher population density. The stations are also closer to large institu-

tional complexes such as universities and hospitals where many of the same characteristics exist.

The undisputed evidence shows that most of the annexed area is located outside of a two mile radius of the closest pumper stations and outside of a two and a half mile radius of the stations housing the tanker and aerial trucks. Petitioners attempt to translate this distance into increased response time to fire alarm calls. In support of this contention, petitioners introduced what they characterize as the "only competent" evidence of response times. The evidence consisted of a record kept several months in 1980 of actual response times by one engine company to fire calls both within the City and in the annexed area. The evidence, petitioners argue, tends to show that the average response time to fires in the annexed area was approximately the same as the longest response time to fires in the City and over a minute longer than the average response time to fires within the City limits.

[2] Petitioners then argue that the City must show in the annexation report that the services (i.e., fire protection) required to be provided by G.S. 160A-47(3)(a) must be provided at a level that is "substantially equal to the *average service* received by citizens of the pre-annexation City." (Emphasis in petitioners' brief.) Under this theory, evidence tending to show a "significant" difference in response times would preclude a finding or conclusion that the City had complied with the statute and would require the judicial invalidation of the annexation ordinance.

Petitioners' argument, however, is not supported in the statute or by previous judicial interpretation and application of the statute. Petitioners have cited no authority and we have found none that supports petitioners' interpretation. Nowhere in G.S. 160A-47 does the concept of equality with "average service" appear in reference to the municipal services to be supplied by the annexing municipality. No reasonable reading of the statutory language permits that inference.

G.S. 160A-47(3)(a) requires that the annexation report reflect the City's plan to provide certain enumerated services "on substantially the same basis and in the same manner" as in the rest of the City. *See In re Annexation Ordinance (Winston-Salem)*, *supra.* Petitioners' notions of equality and average service are not

consistent with the practical application of this language. As was apparent from the evidence presented by the City, there are many variables that affect the level of fire protection afforded to different areas of a municipality: height and size of buildings, construction materials, proximity of buildings to one another and street pattern, among others. That the City of Durham has accounted for these variables is reflected in its placement of fire stations and the equipment and manpower assigned to each. Obviously, the aerial trucks and tanker will respond to fires in the downtown area in less time than to fires in outlying developments. This distribution of available resources reflects the incidence and location of fires requiring heavier, more specialized equipment.

The City's evidence tended to show also that substantially less than half (39.5%) of all reported fires during 1978, 1979 and 1980 required the use of any extinguishing equipment at all. 91.7% of fires requiring extinguishing equipment were capable of being handled by one pumper truck and crew of the type that would respond to fire alarms in the annexed area. 16.4% of those fires were extinguished by the use of hand extinguishers of the type carried on Public Safety patrol cars. More than 68.2% of all reported fires in Durham during a three year period were capable of being handled by an equipped Public Safety patrol vehicle and crew similar to the patrol unit that the annexation report indicates will be added by the City.

The City points out, as it did at trial, that the presence of a public safety patrol unit in the area will reduce the response time to fires. The evidence also tends to show that as a patrol unit becomes familiar with the patrol area, the response time will be reduced for the patrol cars, the pumper trucks, and where required, the aerial and tanker trucks. There was evidence of test runs made by patrol cars under normal traffic conditions that tended to show that response time from the closest fire stations to the annexed area—the ones that would normally respond to an alarm—ranged from three to more than six minutes.

Petitioners' evidence regarding response time accounts for few, if any, of the variables that affect either response time or the location and use of fire fighting facilities. Petitioners' evidence regarding response times does not take into account the

patrol unit that will be added to patrol the annexed area. Furthermore, the records from which petitioners' evidence is drawn are subject to problems (i.e., sample size) that tend to skew the average in favor of longer times, discrediting petitioners' assertion of "average response time" and undermining its statistical validity.

Even if we were to adopt petitioners' concept of "substantially equal to the average service," which we expressly do not, we know of no judicially accepted interpretation of that language against which to measure this case. An argument could be made that the variance in average response times shown here does *not* preclude a finding that the projected level of service would be "substantially equal to the average service" in the rest of the City.

[3] Response time is only one of many factors that enters into the court's consideration of whether an annexation report reflects plans to provide certain required municipal services "on substantially the same basis and in the same manner" as in the pre-annexation City area. *See Food Town Stores, Inc. v. City of Salisbury, supra* (response time one of several factors considered). In the case of *In re Annexation Ordinance (Charlotte)*, 304 N.C. 549, 284 S.E. 2d 470 (1981), our Supreme Court held that the city's failure to include in its plan a notation of the average response time of police cars to the annexed area did not preclude a finding of compliance with the statute. This holding was buttressed by other evidence tending to show that the availability of police protection was the same in the annexed area as in the rest of the city. In the case of *In re Annexation Ordinance (Jacksonville)*, 255 N.C. 633, 122 S.E. 2d 690 (1961), the Supreme Court held that the requirements of the applicable statute were satisfied where the plans for extension of police protection into the annexed area called only for the extension of jurisdictional boundaries and lengthened patrol routes. In that case, which reversed the trial court on other grounds, there was no indicated expansion of fire protection service, only an assertion by the city that fire protection would be provided to the annexed area on substantially the same basis as in the pre-annexation city. The only evidence of response time was the normal response to an adjoining area. *See also Williams v. Town of Grifton*, 19 N.C. App. 462, 199 S.E. 2d 288 (1973) (extension of existing police patrol routes into annexed

area held to satisfy similar statutory requirement affecting annexation by municipalities of less than 5,000 population). As our Supreme Court has held:

> The central purpose behind our annexation procedure is to assure that, in return for the added financial burden of municipal taxation, the residents [of the annexed area] receive the benefits of all the major services available to municipal residents. [Citations.] The minimum requirements of the statute are that the City provide information which is necessary to allow the public and the courts to determine whether the municipality has committed itself to provide a non-discriminatory level of service. . . .

*In re Annexation Ordinance (Charlotte, 1981), supra* at 554, 284 S.E. 2d at 474.

[1] In summary, we find ample evidence in the record to support the court's findings of fact and conclusions of law that the annexation report shows that the City plans to furnish fire protection to the annexed area consistent with the requirements of G.S. 160A-47(3)(a). Petitioners have failed to carry their burden of showing by competent evidence the City's failure to comply with the statute. Their assignments of error in this regard are accordingly overruled.

## II

Section 2 of the annexation ordinance adopted by the Durham City Council declares that the area to be annexed meets the statutory criteria that an area must meet before it is eligible for annexation. G.S. 160A-48. One of the eligibility criteria is that an area be "developed for urban purposes." G.S. 160A-48(c). An area may be classified as "developed for urban purposes" if it meets one of three statutory standards. The standard applied by the City here is population density. G.S. 160A-48 provides as follows:

> (a) A municipal governing board may extend the municipal corporate limits to include any area
>
> . . . .
>
> (2) Every part of which meets the requirements of either subsection (c) or subsection (d)
>
> . . . .

(c) Part of all of the area to be annexed must be developed for urban purposes. An area developed for urban purposes is defined as any area which meets any one of the following standards:

> (1) Has a total resident population equal to at least two persons for each acre of land included within its boundaries;
>
>      . . . .

In the Supplemental Annexation Report, the City describes the method used for estimating population density:

## Method A

Population density is calculated in this method by multiplying the non-city average for persons per dwelling unit times the number of dwelling units in the area to obtain estimated population. Population is then divided by the acreage of the area to obtain population density.

Calculations using this method produced a population density figure of 2.31 persons per acre. Population estimates are provided for in the annexation statutes as follows:

> In determining population and degree of land subdivision for purposes of meeting the requirements of G.S. 160A-48, the municipality shall use methods calculated to provide reasonably accurate results. In determining whether the standards set forth in G.S. 160A-48 have been met on appeal to the superior court under G.S. 160A-50, the reviewing court shall accept the estimates of municipality:
>
> > (1) As to population, if the estimate is based on the number of dwelling units in the area multiplied by the average family size in such area, or in the township or townships of which such area is a part, as determined by the last preceding federal decennial census, . . . .

G.S. 160A-54.

a.

**[4]** In their argument, petitioners contend that the trial court erred in finding as a fact and concluding as a matter of law that the City's estimate of population density was correct and derived in a manner that complied with statutory requirements. Specifically, petitioner contends that the City's estimate of population density is not *prima facie* reliable under G.S. 160A-54(1) because the estimate is based on preliminary rather than final census data. Petitioner argues that the statute, by specifying the use of federal census data, requires the use of *final* rather than *preliminary* census data. We disagree.

The plain language of G.S. 160A-54 contains no requirement regarding the use of final census data and we are aware of no judicially imposed requirement. Furthermore, our Supreme Court in *dicta* has relied on preliminary 1980 census data in reviewing annexation proceedings. *See In re Annexation Ordinance (Winston-Salem), supra.*

Petitioners presented no evidence at trial that the population figures used by the City in computing population density were being challenged or questioned as to verity or accuracy. Rather, petitioners attempt to establish an alternate density figure that incorporates a downward "adjustment" for one bedroom apartments and a "reasonable" 10% vacancy rate for a large apartment complex in the area. Predictably, the figure thus obtained is less than the statutory minimum of two persons per acre. However, the method urged by petitioners is open to considerably more questions than the method that they challenge. The vacancy rate and adjustment for one bedroom apartments are *without objective* justification. The persons per unit average in any census tract inherently accounts for unit size and vacancy rate. Additionally, the persons per unit and total dwelling unit figures used by the petitioners in establishing their alternate density figure are derived from the same *preliminary* census figures used by the City. We are aware of no authority for petitioners' incorporation of an adjustment for unit size or a vacancy rate for rental property. Inasmuch as census figures are based on actual counts, they are inherently more reliable than any formula that alters the figures by arbitrarily assuming vacancy rates and adjusting for dwelling unit size. The population density figure used by the City

was derived in a manner that warranted *prima facie* acceptance by the court and warranted a finding of substantial compliance with the statute.

b.

[5]   Petitioners further contend that G.S. 160A-48 requires that the density standard be applied to "every part" of the annexation area. In connection with this contention, petitioners argue that the presence of one densely populated apartment complex makes possible the annexation of the entire area and that the area is otherwise ineligible. They argue that consideration of the apartment complex together with the surrounding area infringes on the spirit of the annexation laws. We find no merit in this contention. Regarding a similar contention, our Supreme Court said:

> Not only must the entire annexation area *meet* the requirements of [G.S. 160A-48(c)(1)], but even more importantly, the tests to determine whether an area is developed for urban purposes must be *applied* to the annexation area as a whole.

*In re Annexation Ordinance (Charlotte, 1974)*, 284 N.C. 442, 456, 202 S.E. 2d 143, 152 (1974) (emphasis in original). In that case, the Supreme Court held that an application of the population density requirement in the manner urged by petitioners here was contrary to the legislative intent and constituted an "unreasonable departure from statutory standards." *Id.* at 457, 202 S.E. 2d at 152. *See also In re Ordinance of Annexation No. 1977-4*, 296 N.C. 1, 249 S.E. 2d 698 (1978). The application of the population density standard does not, contrary to the petitioners' contention, produce the absurd result contemplated by the Supreme Court in *Lithium Corp. v. Bessemer City*, 261 N.C. 532, 135 S.E. 2d 574 (1964). The court in *Lithium Corp.* notes that literal application of the tests for defining urban development "might in some extreme and improbable circumstances bring about absurd results adverse to municipalities." *Id.* at 538-39, 135 S.E. 2d at 579. That case, however, involved the simultaneous application of the "use" and "subdivision" criteria specified in G.S. 160A-48(c)(3), not the population density test of G.S. 160A-48(c)(1). Petitioners' reliance on *Lithium Corp.* in the present context is therefore misplaced.

   In summary, petitioners failed to prove by competent evidence that the City was not in substantial compliance with the re-

quirements of G.S. 160A-48. Accordingly, we find no merit in petitioners' assignments of error.

## III

In their third argument, petitioners assign as error several evidentiary rulings by the trial court.

### a.

[6] Petitioners first contend that the court below erred in allowing the City to present evidence of test runs made by patrol cars from existing municipal fire stations to points within the annexed area. The first occasion on which the evidence was admitted was when the court allowed the City to offer answers to petitioners' interrogatories that were not included in petitioners' presentation of evidence. Petitioners contend: (1) that this procedure violated the rule that discovery not offered by the discovering party is not permitted to be made part of the record during that party's presentation of its case unless necessary to prevent those portions already in the record from being misleading; (2) that the answers read into the record by the City were "essentially non-answers and . . . nothing but conclusory statements" and hearsay; and (3) that a proper foundation had not been laid for the admission of this evidence.

As authority for their contentions, petitioners cite Rules 26 and 32 of the Rules of Civil Procedure. Rule 32 provides in pertinent part:

> If only a part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which is relevant to the part introduced and any party may introduce any other parts.

Nothing in this rule would prevent the City's offer of the challenged evidence at the time it was introduced. Petitioners had previously read into the record answers to interrogatories concerning the distances from public safety stations to certain points in the annexation area. Other answers relating to how this distance translated into response times are clearly relevant. It was not error for the court to allow those answers to be read into the record.

We find petitioners' contentions regarding the hearsay and conclusory nature of the answers to be without merit.

b.

[7] Petitioners next contend that the evidence of the test runs made by the patrol cars is inadmissible because the test runs were not conducted under conditions that would simulate an alarm response by a fire engine. Petitioners' contention is based on evidentiary rules governing the admission and use of the results of experiments conducted for the purpose of proving or disproving an event or occurrence relevant to an issue in the trial.

We note, however, that the situation before us is not typical of situations in which experimental evidence is normally used. The cases cited by both parties and in Professor Brandis' treatise on North Carolina evidence involve attempts to recreate in an experiment the conditions surrounding events that have *already occurred. See* Brandis, N.C. Evidence § 46 (1982) and cases cited therein. Here, the test runs made by the City were offered as evidence tending to establish a basis upon which future response times could be estimated. The prospective outlook of this evidence necessarily removes it from the strict requirement of substantial similarity that is invoked in the typical experiment situation. *E.g., State v. Jones,* 287 N.C. 84, 214 S.E. 2d 24 (1975); *Hall v. Railroad Co.,* 44 N.C. App. 295, 260 S.E. 2d 798 (1979), *rev. denied,* 299 N.C. 544, 265 S.E. 2d 404 (1980). When seeking to offer a basis for projecting future performance in response to a myriad of possibilities, the substantial similarity requirement would be impossible to apply. While the conditions surrounding the test runs are certainly relevant to the issue before the court, failure to establish similarity to the degree normally required does not render that evidence incompetent. Any discrepancy in conditions may be brought out on cross-examination by the opposing party and would affect the weight rather than the admissibility of such evidence. The weight attached to evidence properly before the court is a question that is not reviewable by us. *Coble v. Coble,* 300 N.C. 708, 268 S.E. 2d 185 (1980). The test runs made by the City, insofar as they are relevant to the issue before the court and have probative value, were competent evidence. It was not error for the trial court to consider it.

c.

Petitioners also contend that the evidence of the test runs is insufficient to support the findings of fact. The question of sufficiency of the evidence to support those findings was considered above in part I of the opinion and resolved in favor of the City. Beyond noting that this is not the only evidence supporting those findings of fact, we do not discuss that question further. Petitioners' contention is without merit.

d.

Petitioners next contend that the persons per dwelling unit and dwelling unit figures used by the City in calculating population density were "obtained by a process of double hearsay" and should have been excluded. Petitioners base this contention on testimony by a witness for the City, a planner with the City of Durham, that he telephoned the Durham County planning department and obtained from an unidentified person figures that he was told were taken from preliminary census data. The same witness testified that the figures thus obtained were subsequently verified by actual census data and that there was no discrepancy. This testimony was admitted over the objection of petitioners.

[8] Our courts have recognized the expediency of applying the formal rules of evidence less strictly in proceedings before a judge than in trials involving a jury. *Cameron v. Cameron,* 232 N.C. 686, 61 S.E. 2d 913 (1950). Thus, where a finding of fact made by the judge sitting without a jury is supported in the record by competent as well as incompetent evidence, a rebuttable presumption arises that the judge disregarded the incompetent evidence and based his consideration solely on the competent evidence. *Mayberry v. Insurance Co.,* 264 N.C. 658, 142 S.E. 2d 626 (1965). *See generally* Brandis, N.C. Evidence § 4a (1982); McCormick on Evidence § 60 (2d ed. 1972).

In the instant case, there is competent evidence in the form of the witness's testimony that the figures used to calculate population density were verified against actual census data. Because there was no discrepancy in the figures as verified, there was no need to recalculate population density. The population density figure used by the City was derived from competent evidence. It was not error for the court to consider it.

## IV

Petitioners' final argument purports to question the constitutionality of several of the statutes governing the annexation process. Our review of the record below discloses that none of these questions were raised or considered in the trial court. We are therefore not bound to consider them on appeal. *State v. Hunter*, 305 N.C. 106, 286 S.E. 2d 535 (1982); *Lane v. Insurance Co.*, 258 N.C. 318, 128 S.E. 2d 398 (1962). In our discretion, however, we have reviewed petitioners' contentions and dispose of them below.

### a.

[9] Petitioners contend that the time limitations specified in G.S. 160A-49 (establishing the procedure for annexation) and G.S. 160A-50 (regarding appeals from the adoption of an annexation ordinance) constitute unreasonable procedural burdens on their due process rights under the United States and North Carolina Constitutions. Petitioners cite no authority for their contention and we are not persuaded by their argument.

In *Kritzer v. Town of Southern Pines*, 33 N.C. App. 152, 234 S.E. 2d 648 (1977), this court held that in annexation proceedings, the rights of the general public and of petitioners under G.S. 160A-49 were adequately protected by G.S. 160A-49(b) and (e). These provisions both contain some of the time limitations which petitioners contend render the statute unconstitutional. The other limitation complained of requires the City to make the annexation report available to the public at least fourteen days prior to the public hearing on annexation. *See* G.S. 160A-49(c). Other than simply asserting an unconstitutional burdening of their rights, petitioners have failed to demonstrate prejudice or even to assert with particularity how their due process rights might have been violated. Accordingly, we hold that they have presented no question of constitutionality to be resolved by us. *Nicholson v. Educational Assistance Authority*, 275 N.C. 439, 168 S.E. 2d 401 (1969).

### b.

[10] In *Moody v. Town of Carrboro*, 301 N.C. 318, 271 S.E. 2d 265 (1980), *reh. denied*, 301 N.C. 728, 274 S.E. 2d 230 (1981), our Supreme Court expressly approved the procedure established in G.S. 160A-50. The court there held that the clear intent of the

---

---

legislature was to provide an expedited judicial review, limited in scope, and avoiding unnecessary procedural delays. In view of the lack of contrary authority, the Supreme Court's opinion in *Moody* is dispositive of this issue.

[11]   Finally, petitioners argue that G.S. 160A-48 is unconstitutionally vague. Petitioners base their contention on the language of G.S. 160A-48(a)(2) which requires "[e]very part" of the area to be annexed to meet the requirement of subsection (c) that "[p]art of all" of the area must be developed for urban purposes. *See* pertinent text of G.S. 160A-48 set out in part II of this opinion *supra.* Petitioners contend that the quoted words put the two interlocking subsections in direct conflict with one another and render the statute unconstitutionally vague. We disagree.

Our Supreme Court has previously considered and rejected similar contentions based on the same language. *In re Annexation Ordinance (Charlotte, 1974)* and *In re Annexation Ordinance (Jacksonville)*, both *supra.* We considered the application of G.S. 160A-48 in the present case in part II of this opinion. We view the Supreme Court opinions in the above-cited cases as dispositive of the issue and decline to consider it further. Petitioners' contentions are without merit.

V

In light of our decision above, we need not consider respondents' cross-assignment of error and the arguments advanced in support thereof.

For the reasons stated, the judgment of the Superior Court is affirmed.

Judges WEBB and PHILLIPS concur.